## Case No. 1,801.

### BRAGG et al. v. MEYER.

[McAll. 408; 39 Hunt, Mer. Mag. 577.][1]

Circuit Court, D. California. July Term, 1858.

FACTORS AND BROKERS—POWERS AND LIABILITIES—AUTHORITY TO PLEDGE — FEDERAL COURTS—FOLLOWING STATE DECISIONS.

1. If a party entrusts his property to a broker for sale, who pledged it to a third party to secure the payment of money borrowed for his own use, the owner can recover the property from the lender who has obtained possession of it.

2. The possession of the goods by the broker conferred no power on him to pledge the property to secure his own debt.

3. If he was acting notoriously as broker, his operating in two or three instances on his own account does not denude him of the character of broker.

4. The delivery by plaintiff of the possession of the goods to the broker for the purpose of sale, did not authorize him to pledge them; and nothing less than proof of a usage in San Francisco that the general custom was under no circumstances to trust the goods to the broker, will authorize the inference of a power to pledge them.

5. The question involved in this case being a commercial one, must be adjusted by the application of the principles of the law merchant, and does not come within that class of cases where the decisions of the state courts conclude the action of this court.

About the 31st day of May, 1858, the plaintiffs employed one Edward Heilbruth, a merchandise broker, to sell as a broker, 650 bags of Manilla coffee. A day or two subsequent to which employment, the broker reported to the plaintiffs that he had sold 200 bags of said coffee to one M. Dubroca, and the remaining 450 to one C. Vanard; that both of said sales had been made on a credit of thirty days; that the respective purchasers

desired the delivery of the coffee; and, therefore, he wished orders for the delivery of the same from the warehouse of D. Gibb & Co., where said coffee had been stored, for the purpose of delivering the same to the purchasers. Thereupon, the plaintiffs delivered to the said broker the orders for the purpose of having the coffee delivered to the reported purchasers. Two warehouse-orders were given; one for 200 bags of coffee to the said Heilbruth, the other, for 450 bags deliverable to the order of said Heilbruth. The reported sales to Dubroca and Vanard were regularly entered by the plaintiffs in their sales book; and they had no suspicion but that the same were veritable and bona fide.

[2] On or about the 3d June, 1858, Heilbruth having possessed himself of the two warehouse-orders drawn by plaintiffs on D. Gibb & Co., called upon T. Lemmen Meyer, the defendant, to borrow money on the security of the coffee. Heilbruth told Meyer that the coffee was stored at D. Gibb & Co.'s warehouse, whereupon Meyer said he would advance the money requested on a pledge to him of the 650 bags of coffee; but, before he would advance a dollar, the coffee must be stored in the warehouse of one Strauch (a friend of Meyer); and that when Heilbruth produced Strauch's warehouse-receipt, showing that the said coffee was stored in his (Strauch's) warehouse in his (Meyer's) name, he would give the amount of loan desired, $3,700. No evidence was given to show that any papers were ever exhibited to defendant by Heilbruth, or that the former asked for any. On the 4th of June, 1858, the 650 bags of coffee were transferred from the warehouse of D. Gibb & Co., to that of Strauch, and stored in the store of the latter, in the name of Meyer. On the presentation to latter by Heilbruth of the receipt of Strauch, the loan was completed; Meyer taking the individual note of Heilbruth, with a written pledge of the coffee as security.

On the following day, Heilbruth absconded from San Francisco, in the steamer which left for Panama on that date. A few days subsequent to the departure of that steamer, the plaintiffs discovered the falsity of the reported sales made by Heilbruth, and learned that the coffee was in the possession of the defendant. A demand having been made for the coffee and refused, the present action is brought for its recovery.

[Verdict for plaintiffs.]

Hall McAllister, for plaintiffs.
S. L. Johnson, for defendant.

---

[1] [Reported by Cutler McAllister, Esq. 39 Hunt, Mer. Mag. 577, contains only a partial report.]

[2] [NOTE. The following statement as to the loan is from 39 Hunt, Mer. Mag. 577: "On the 2nd of June, Heilbruth negotiated a loan from Meyer for $1,200 on the 200 sacks, and on the following day that number of sacks was stored in Strauch's warehouse. On the same day Heilbruth negotiated a further loan of $2,700 from the defendant on the remaining 450 sacks, which were also stored in Strauch's warehouse."]

The following charge to the jury, with instructions, were given by—

McALLISTER, Circuit Judge: This is a controversy between two honest parties, as to which of them shall bear the loss consequent upon the fraudulent conduct of a third. The plaintiffs placed their merchandise in good faith in the hands of a third party, to sell. The defendant, with equal good faith, loaned money to that third party, taking as security, the goods of the plaintiffs, in ignorance of the fact.

The case of the plaintiffs rests upon the application of the rule "caveat emptor;" that of the defendant upon the proposition, that when one of two innocent parties must suffer by the fraud of a third, the one who enabled such third party to commit the fraud by placing him in possession of the goods by whose instrumentality the fraud was committed, should be the sufferer.

The transaction out of which this controversy arises, is a commercial one, and must be determined by the general principles of commercial law, which constitute a part of the common law, adopted by this state. It would be passing strange, if amid the varied transactions, so ordinary an occurrence as the circumvention of two merchants by one dishonest person, has not, unfortunately, too frequently been encountered by the investigation of courts and juries. The principle involved in this case, is by no means novel; but its great practical importance in a mercantile community, and the supposition that it has been permanently settled by the adjudications of the supreme court of this state, induce this court to give it a more extended inquiry, than under ordinary circumstances would have been demanded by any intrinsic novelty or difficulty in the question.

Reliance has been placed by counsel for defendant on the case of Leet v. Wadsworth, 5 Cal. 404, and on that of Hutchinson v. Bours, 6 Cal. 383. Before examining these cases, it will be proper to ascertain, assuming that they go to the extent contended for, how far they are to control the action of this court. The supreme court of the United States have on more than one occasion given their views upon this point. They have decided that the 34th section of the judiciary act of 24th September, 1789 [1 Stat. 92], which makes the laws of the several states rules of decision for the federal courts, is confined to local statutes of a state, and the construction thereof, by her courts, and with matters connected with titles to real estate, and matters strictly intra-territorial; and they say: We have not the slightest difficulty in holding that said section does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect whereof are sought, not in the decisions of the local tribunals, but in the general principles of commercial jurisprudence. Undoubtedly, the decisions of local tribunals upon such subjects are entitled to, and will receive the most deliberate attention and respect of the court; but they cannot furnish rules or conclusive authority by which our own judgments are to be bound and controlled. Swift v. Tyson, 16 Pet. [41 U. S.] 1. No legislation of this state has regulated the point under consideration. It must therefore be decided by a resort to the principles of the law merchant.

I have made the foregoing observations, in the event if the two authorities cited from the supreme court of this state shall be deemed to cover this case, they may not be supposed to control conclusively the action of this tribunal. My examination of those cases, however, has brought me to the conclusion, whatever may be the strength of the language in the opinions of the court, no decision was made in either case upon the exact point under consideration. In the first case (Leet v. Wadsworth) the factor had purchased goods in his own name, had stored them in his own name, and paid the storage upon them for eighteen months, the principal being in the mean time frequently in San Francisco, in intimacy with the agent. The factor pledged the goods to a third party. Now, the court may have well decided that case on the ground that it belonged to that special class in which the owner had been guilty of gross negligence, amounting to fraud upon a third party, and was therefore estopped from setting up his title. That the court did not intend to impinge on the general rule, is evident from their stating "at common law, the business of a factor was merely to sell the goods of his customers; so it followed, that his possession was no evidence of his ownership, and as he was not allowed to pledge the goods of his principal, in case he did so, the pledgee was chargeable with notice of the true owner's right." And they placed this decision on the ground that the party who pledged had purchased the goods in his own name, which afforded proof of apparent ownership, and he was therefore entitled to sell or pledge.

In the second case (Hutchinson v. Bours) the decision recognizes the general rule; for the court say, "Where the party pledging is technically a broker, where his only business is to sell goods consigned to him for that purpose," he has power to sell them only, and no power to pledge them. While thus affirming the general rule, the court in that case deny its applicability, inasmuch as the party who pledged was not a technical factor; whom they decide to be one whose only business is to sell goods consigned to him. Out of the city of London, where there are special legislative organizations of brokers, I can find no distinction drawn by any text-writer, or any illustration by decided cases, between a technical or any other kind of broker. I take one who notoriously acts as a broker, and sells the property of others so publicly as to be known as acting as such, to be a broker; if not so notoriously known, he

is neither a technical nor any other kind of broker. The fact that one occasionally operates on his own account will not denude him of the character of a broker, if he really acts notoriously as such. There are numerous cases in which one has been recognized to be a factor or broker, who in addition to his business as such occasionally dealt on his own account. In Martini v. Coles, 1 Maule & S. 140, Vos was decided to be a factor, although simultaneously he acted as a general merchant. In Phillips v. Huth, 6 Mees. & W. 573, Warwick, the factor, was also "an extensive dealer in tobacco," and pledged the plaintiff's "dock-warrants" at the same time with some of his own. In Baring v. Corrie, 2 Barn. & Ald. 137, Coles & Co. were merchants as well as brokers, and bought and sold largely on their own account, and had before the time of the sale of the sugars in question, dealt with defendants both in buying and selling on their own account. Yet (say the court) these facts did not exempt them from the operation of the general rule applicable to brokers. In McCombie v. Davies, 6 East, 538, Coddan, the broker, was "also a dealer in tobacco on his own account." Other cases to the same point might be cited. I can see no such incompatibility in a man notoriously following the occupation of a broker or factor and his occasionally operating on his own account, as should disqualify him from being considered as a factor or broker. In Hutchinson v. Bours, the supreme court of this state may have gone upon the ground that the character of factor in that case had become merged in the great mass of business transacted by him on his individual account. After a careful review of the cases cited from the supreme court, I have not satisfied myself that the exact point in this case was decided in either of those cases. If they do cover this case as contended by defendant's counsel they cannot conclude this court.

The question must be decided by a resort to the general principles of commercial law. Although the possession of personal chattels is said to be prima facie evidence of property, and consequently of an apparent power of disposition, yet it is no less true, that when property does not in fact exist, possession confers no right either on the holder himself or a vendee under him who pays a valuable consideration on the faith of such possession. The only exception to this rule at common law is, that of a sale in market overt; which is inapplicable to this country. The views expressed by a recent writer on the sale or pledge of chattels personal are so sound, that it is proper to bring them to your notice. He says, "There are, indeed, only two grounds on which property can be supposed to arise in a vendee in consequence of a sale made by a vendor who has no property in himself. The first of these supposes a transfer of the title of the true owner by virtue of some express or implied authority

from him; the second, the creation of a new and independent title growing out of the circumstances attendant upon the sale; such as the possession of the property by the vendor, the valuable consideration paid by the purchaser, and the bona fides of the transaction so far as he is concerned." 1 Smith, Lead. Cas. 894. It is not contended in this case, that an express authority was given to pledgee; and so far from there having been an implied one, the relation which existed between Heilbruth and the plaintiffs (provided you shall believe that the former was a broker and was employed as such by plaintiffs) directly disaffirms any implied authority to Heilbruth to pledge. It is within the second class of cases referred to, defendant seeks to bring himself. He contends that where one of two innocent persons must suffer by the fraud of a third person, he who placed that third party in possession, and thus enabled him to perpetrate the fraud, must bear the loss.

Now, if this be a sound proposition, it would follow that the well-settled rule of "caveat emptor" must be dispensed with, and that the possession of goods by a quasi public officer (a broker) to sell, constitutes a title which authorizes him to pledge them for his own debt. The writer last cited alludes to this proposition in these words: "It has been sometimes argued, that where one of two innocent parties must suffer from a sale under these circumstances, the loss should fall upon the owner, who has entrusted the vendor with the possession of the goods and enabled him to commit a fraud, rather than the vendee who acts in good faith and with proper caution. But if this conclusion could follow in any case, it would do so in those where a factor has been entrusted with the indicia of title in chattels, in addition to the possession of the chattels themselves, and with the authority not only to sell them, but to sell them as his own, and has thus been enabled to hold himself out to the world as the owner, in contracts with third parties, who advance money on the faith of his apparent ownership, and a deposit of the goods in pawn. Yet it is well settled, that such a pledge gives no right whatever to the goods as against the real owner, not even that of the factor." Id. 896. To sustain this well-settled doctrine, the author refers to numerous authorities from England and this country. Chancellor Kent, in his Commentaries, says, "Though a factor may sell and bind his principal, he cannot pledge the goods as security for his own debt, not even though there be the formality of a bill of parcels and a receipt. The principal may recover the goods of the pawnee; and his ignorance that the factor held the goods in the character of factor is no excuse. The principal is not even obliged to tender to the pawnee the balance due from the principal to the factor; for the lien which the factor might have had for such balance is personal, and cannot be

pledged by his tortious act in pledging the goods for his own debt. If the pawnee will call for the letter of advice, or make due inquiry as to the source from whence the goods came, he can discover (say the cases) that the possessor held the goods as factor, and not as vendee, and he is bound to know at his peril the extent of the factor's power." 2 Kent, [Comm.] 625.

I have given you the law on this subject; but it is necessary to say, in order that you may be prepared to meet any state of facts which may present themselves to you, that if the conduct of plaintiff has been unusual and contrary to the course of business to such extent as to mislead third parties who act with reasonable care, such a case would constitute an exception to the rule. The only ground taken in this case as to the conduct of the plaintiff is, that he parted with the possession of the goods at the time he authorized the broker to sell.

Upon this and the other points in the case, I give you, gentlemen, the following instructions:

1. If you shall find from the evidence, that Edward Heilbruth was a merchandise broker; that he acted as such in this city; that the plaintiffs entrusted to him their property, as such broker, to sell; and that he pledged those goods to the defendant, to secure his individual indebtedness to him,—in such case, you will find a verdict for the plaintiffs, unless you find the case to be within the exception stated in the instruction No. 4, hereafter to be given.

2d. The possession of the goods by Heilbruth, as broker, conferred no authority on him to pledge them; the relation he bore to the plaintiffs disaffirmed all such authority; and the ignorance of pawnee as to the character in which Heilbruth acted, cannot defeat this action. It is a case to which the rule of "caveat emptor" must apply.

3d. If you find that the character of Heilbruth was that of a merchandise broker, and plaintiffs entrusted their property to him as such, the fact, if you should so find, that he occasionally on one, two, three occasions or more, during the time he acted as broker, had some transactions on his own account, such fact will not annul his character as broker, or deprive the plaintiffs of the protection which the law extends to them by reason of the relation which existed between them as principals and Heilbruth as their broker.

4th. If you should be of opinion that, according to the usual course of business, and in the exercise of due care and prudence, the plaintiffs should not have delivered possession of the coffee to Heilbruth; that their so delivering it to him enabled him to practice a fraud upon the defendant, and that defendant exercised reasonable care and diligence to avoid that fraud, according to the usual course of business in San Francisco, you must find for defendant.

This last instruction is asked for by defendant, and is acquiesced in by the counsel for the plaintiffs. I therefore give it to you, with the caution that you are to take it together with the preceding instructions, when you are deciding upon the conduct of plaintiffs in delivering possession of the goods to the broker. That fact alone, unless proved to be opposed to a well-established usage in San Francisco, cannot defeat the present action.

Verdict for plaintiff, $1,875.

[NOTE. The following is from 39 Hunt, Mer. Mag. 577: "The jury, after an absence of about an hour, came into court and rendered a verdict in favor of plaintiff for return of the property or the value thereof, it being assessed at $4,875."]